IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:14-CV-36-FL

| | | |
|---|---|---|
| RETIREMENT COMMITTEE OF DAK AMERICAS LLC, as Plan Administrator of the DAK Americas LLC Pension Plan; and TRANSAMERICA RETIREMENT SOLUTIONS CORPORATION, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | ORDER |
| RODNEY B. SMITH, DAVID W. ALLEN, MICHAEL LYNN BASS, JOSEPH ALEXANDER BELLAMY, MARK STEPHEN BREWER, JEROME BRYANT, HAROLD E. CORBETT, KELVIN L. GALLOWAY, WARREN ALBERT GARRISON, JAMES F. HOLLAND, WILLIAM LACEY NELSON, SIDNEY HUGH RHODES, JIMMIE RAY SELLERS, MENDELL W. SMITH, and OTELLA IRENE WEBB, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

This matter comes before the court on motions for summary judgment filed by defendants Mark Stephen Brewer ("Brewer"), Harold E. Corbett ("Corbett"), Warren Albert Garrison ("Garrison"), James F. Holland ("Holland"), William Lacey Nelson ("Nelson"), Sidney Hugh Rhodes ("Rhodes"), and Jimmie Ray Sellers ("Sellers") (DE 114); and defendant Rodney B. Smith ("Rodney Smith") (DE 130). Also before the court are plaintiffs' motions for summary judgment (DE 153, 181) and to strike expert testimony (DE 157), as well as the parties' joint motion for hearing (DE 152). The motions have been fully briefed, and the issues raised are ripe for ruling.

## STATEMENT OF THE CASE

Plaintiffs filed suit on February 20, 2014, under § 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(3), to recover alleged overpayments of pension benefits made to defendants (collectively the "alleged overpayments"). Plaintiffs seek equitable restitution of the alleged overpayments, which they claim belong in good conscience to the DAK Americas LLC Pension Plan (the "Plan"). Plaintiffs seek an order requiring defendants to return the alleged overpayments to the Plan, along with pre- and post-judgment interest, attorneys' fees, and costs. Plaintiffs obtained, on March 24, 2014, a consent preliminary injunction pending final resolution of this matter enjoining defendants from spending, transferring, or otherwise diminishing the alleged overpayments.

One subset of defendants, denominated by the parties as the "Baker" defendants,[1] filed an answer on May 2, 2014. The Baker defendants comprise David W. Allen ("Allen"), Michael Lynn Bass ("Bass"), Joseph Alexander Bellamy ("Bellamy"), Jerome Bryant ("Bryant"), Kelvin L. Galloway ("Galloway"), Mendell W. Smith ("Mendell Smith"), and Otella Irene Webb ("Webb"). While denying that there was an overpayment of pension benefits to them, the Baker defendants state that they have returned the alleged overpayments to plaintiffs. The Baker defendants filed counterclaims on August 25, 2014, and September 4, 2014, as amended, asserting (1) breach of fiduciary duty and surcharge against both plaintiffs; (2) constructive fraud against plaintiffs; (3) a claim to recover benefits due based on the terms of the Plan; (4) a claim to recover benefits due based upon an alleged reduction of accrued benefits or subsidies; and (5) a claim of equitable restitution based upon equitable estoppel. The Baker defendants seek return of the alleged

---

[1] The Baker defendants are so denominated because they are all represented by the law firm Baker & Slaughter, P.A.

overpayments; surcharge and damages, plus interest; constructive trust; interest, costs, and attorneys' fees; and such further relief as the court may deem just and proper.

Another subset of defendants, denominated by the parties as the "Ward" defendants,[2] filed an answer and counterclaim, as amended, on July 3, 2014. The Ward defendants comprise Brewer, Corbett, Garrison, Holland, Nelson, Rhodes, and Sellers. The Ward defendants deny that there was an overpayment of pension benefits mistakenly made to them, and they admit that they hold and have refused to return the alleged overpayments. The Ward defendants assert the following counterclaims: (1) breach of fiduciary duty and surcharge, and (2) constructive fraud. The Ward defendants seek dismissal of the complaint; damages and surcharge in excess of $25,000.00, plus interest; costs; and such further relief as the court may deem just and proper.

Defendant Rodney B. Smith ("Rodney Smith") filed an answer and counterclaim on February 17, 2015.[3] Defendant Rodney Smith denies that there was an overpayment of pension benefits to him, and states he has not returned any alleged overpayment. Defendant Rodney Smith asserts the following counterclaims: (1) breach of fiduciary duty and surcharge, and (2) constructive fraud. Defendant Rodney Smith seeks dismissal of the complaint; damages and surcharge in excess of $25,000.00, plus interest; costs; reasonable attorneys' fees; and such further relief as the court may deem just and proper.

Plaintiffs filed their first motion for summary judgment on February 17, 2015, (DE 153), seeking judgment as a matter of law on their claim for equitable restitution against all defendants,

---

[2] The Ward defendants are so denominated because they are all represented by attorneys with the law firm Ward and Smith, P.A.

[3] Rodney Smith filed a motion to dismiss for failure to state a claim on April 28, 2014, asserting arguments later asserted again in his motion for summary judgment. Accordingly, on March 2, 2015, the court dismissed as moot defendant Rodney Smith's motion to dismiss.

and on all counterclaims asserted by the Baker and Ward defendants.[4]  The Baker and Ward defendants responded in opposition,[5] and plaintiffs replied.

The Ward defendants filed a motion for summary judgment on February 17, 2015, (DE 114), seeking judgment as a matter of law on plaintiffs' claim for equitable restitution.[6]  Plaintiffs responded in opposition.[7]  Defendant Rodney Smith filed a motion for summary judgment on February 17, 2015, (DE 130), seeking judgment as a matter of law on plaintiffs' claim for equitable restitution, and advancing arguments in favor of his counterclaims.[8]  Plaintiffs responded in opposition,[9] and defendant Rodney Smith replied.

---

[4]  In support of their first motion for summary judgment, plaintiffs rely upon the following materials: (1) admissions in the Baker defendants' answer and counterclaims, and the Ward defendants' answer and counterclaims (DE 57, 80, 94, 98); (2) the Administrative Record ("AR") generated during the review of defendants' claims for benefits, attached as Exhibit A to the Declaration of Stephen Seals, a DAK Americas LLC employee ("Seals Dec.") (DE 154-14, 155-156); (3) the deposition of Andrew Lumb, a former employee of plaintiff Transamerica Retirement Solutions Corporation, and exhibits thereto (DE 254-2) ("Lumb Dep."); and (4) the parties' responses to interrogatories and requests for production (DE 154-3 to 154-6).

[5]  In opposition, the Baker defendants rely upon documents attached to the complaint and their answer and counterclaims, (DE 1, 57, 94, 98), as well as expert reports and testimony of actuary Ronald Roth ("Roth"). (DE 159). In opposition, the Ward defendants rely upon documents attached to the complaint and their answer and counterclaims, (DE 1, 80), as well as materials in support of their own motion for summary judgment, set forth below.

[6]  In support of their motion for summary judgment, the Ward defendants rely upon the following materials: (1) the complaint and exhibits thereto; (2) expert reports and testimony of actuary John Gregory Gaston ("Gaston") and Roth (DE 140, 144, 145, 149, 150); (3) the Lumb deposition and exhibits thereto (DE 115-138); (4) a DAK Americas LLC internal email dated July 15, 2013 (DE 141); (5) a report by the Advisory Council on Employee Welfare and Pension Benefit Plans to the Secretary of Labor dated November 2013 (DE 142); (6) discovery responses (DE 143, 147); (7) the summary plan description (DE 146); (8) demand letters on behalf of plaintiffs (DE 148); and (9) an investment agreement between Diversified Investment Advisor, Inc. and DAK Americas (DE 151).

[7]  Plaintiffs attach to their response a declaration of Edmond Ryan, Senior Vice President, Defined Benefits, employed by Transamerica Retirement Solutions Corporation (DE 179-1).

[8]  In support of summary judgment, defendant Rodney Smith relies upon the following materials: (1) his affidavit (DE 131); (2) an affidavit of Bryan T. Beck, former employee of DAK Americas (DE 132); (3) expert reports and testimony of Gaston (DE 134, 139); (4) plaintiffs' internal emails, as well as correspondence with defendant Rodney Smith (DE 139-1 to -7, 10-11); (5) Lumb deposition excerpts (DE 139-8); (6) internal "Scoping and Requirements" documents (DE 139-9, -10); (7) discovery responses (DE 139-13); and (8) lump sum calculation tables (DE 139-16).

[9]  In opposition, plaintiffs rely upon materials submitted previously in support of their first motion for summary judgment. (DE 153, 179, 180)

Plaintiffs filed their second motion for summary judgment on April 10, 2015, (DE 181), seeking judgment as a matter of law on defendant Rodney Smith's counterclaims. Defendant Rodney Smith responded in opposition.[10]

On February 17, 2015, plaintiffs filed a motion to exclude expert reports and testimony of Gaston and Roth, which are relied upon by defendants in support of their motions for summary judgment and counterclaims. Defendant Rodney Smith responded in opposition, and plaintiffs replied. The parties also filed a joint motion for hearing on February 17, 2015.

## STATEMENT OF UNDISPUTED FACTS

Defendants are former employees of DAK Americas LLC ("DAK") who worked at a DAK manufacturing facility in Wilmington, North Carolina, (the "Cape Fear facility"). They are former participants in the Plan, which was established by DAK "to assist its employees in providing a life income for their support following their retirement from" employment with DAK. (AR 10).[11] The Plan is administered by plaintiff Retirement Committee of DAK Americas LLC (the "Committee"). The Plan contracts with plaintiff Transamerica Retirement Solutions Corporation ("Transamerica") to provide certain fiduciary and administrative services in connection with the operation of the Plan, including calculating and executing pension benefit distributions.

In or about June 2013, DAK announced that it was planning to close the Cape Fear facility. On July 23, 2013, DAK amended the Plan "in order to provide for an immediate lump-sum option"

---

[10] In support of their motion, plaintiffs rely upon the same materials filed in support of plaintiffs' first motion for summary judgment (DE 154) and responses in opposition to motions for summary judgment by Rodney Smith and the Ward defendants. (DE 179, 180). In opposition, defendant Rodney Smith also relies upon materials previously filed. (DE 55, 75, 139, 169, 171, 185).

[11] Citations to "AR" are to the page numbers specified in the Administrative Record ("AR") generated during the review of defendants' claims for benefits, attached as Exhibit A to the Declaration of Stephen Seals, a DAK Americas LLC employee ("Seals Dec.") (DE 154-14, 155-156).

for payment of Plan benefits to participants terminated as a result of the closure of the Cape Fear

facility. (AR 003). The July 23, 2013 Plan amendment, captioned "Amendment No. One,"

(hereinafter referred to as "Amendment One"), added a new Section 4.15 to the Plan, which provides

as follows:

> 4.15     Special Immediate Payment for Certain Participants: Each
> Participant in the group of Participants at the Employer's Cape Fear site who is
> severed from service with the Employer as a result of closing the Employer's plant
> at the Cape Fear site on or about September 1, 2013 (a "Cape Fear Participant")
> shall, subject to the spouse consent requirements of Section 4.10(c)(2), have the
> option to elect to receive an immediate lump sum distribution within 60 days
> following such severance from service. Such lump sum shall be Actuarially
> Equivalent to the Cape Fear Participant's Accrued Benefit and shall not be available
> if the Cape Fear Participant does not elect it with such time period. Any such Cape
> Fear Participant who has not yet reached his Early Retirement Age also shall have
> the option to receive an actuarially equivalent (determined on the basis of the
> Applicable Interest Rate and the Applicable Mortality Table defined in Section
> 2.1(a)(2)) immediate annuity payable in the form of a Qualified Joint and Survivor
> Annuity or a Joint and Survivor annuity (as described in Section 4.11(a)(2)) with
> 75 percent of the amount payable to the Cape Fear Participant payable to the Cape
> Fear Participant's Surviving Spouse after the Cape Fear Participant's death.

(AR 003).[12]

Defendants were separated from service with DAK in or about September or October 2013.

(See, e.g., AR 232; DE 139-7). Between September 16, 2013, and October 15, 2013, Transamerica

sent each defendant a letter informing them that the Plan "is offering you a limited time opportunity

to elect a lump sum payment representing the entire value of your vested accrued pension benefit

under the Plan." (E.g., AR 201; DE 139-4) (hereinafter the "initial distribution letters"). The initial

distribution letters contain identical introductory form language and offer each defendant an

---

[12] The court underlines terms that are defined elsewhere in the Plan, where those terms are discussed herein in the court's analysis, and where such terms are included in APPENDIX A to his order, providing a list of defined terms and their definitions or pertinent excerpts thereof as set forth in the Plan. The court otherwise uses bolding or italics for emphasis added and emphasis in the original.

6

opportunity to complete a "Voluntary Lump Sum Application" (hereinafter the "initial Lump Sum Application") (Id.). The initial distribution letters state that "[t]he special one-time lump sum payment will be valued as of October 1, 2013," and note "[y]ou also have the opportunity to begin receiving a monthly annuity benefit paid in accordance with the normal terms of the Plan." (Id.). Each initial distribution letter then states "[t]he lump sum value of your accrued pension benefit under the Plan as of October 1, 2013 is equal to:" followed by a dollar figure in bold type. For example, the figure provided was $366,427.80 for defendant Bryant and $554,638.72 for defendant Rodney Smith. (Id.).[13]

The initial Lump Sum Application attached to each initial distribution letter is a form in multiple sections for making elections between various distribution options. Section E "Forms of Benefit," describes the election options and the dollar amounts of the lump sum payout and annuity options. For example, the form for defendant Bryant specifies amounts for the first three of nine election options as follows:

**Special One-Time Lump Sum Payout**

☐    I elect to receive the present value of my accrued benefit equal to **$366,427.80** in one payment. . . . The relative value of this benefit to the Single Life Annuity is **100%.**

**Single Life Annuity** (Normal form of payment if you are not married)

☐    I elect to receive **$1,918.43** per month for the remainder of my life. When I die payments will stop. . . .

**50% Joint and Survivor Annuity** (Normal form of payment if you are married) . . .

_____

[13] Both the Baker defendants and the Ward defendants use defendant Bryant as an example for illustrative purposes, where the processes involved for defendant Bryant were the same as those for all of the Baker defendants and the Ward defendants unless otherwise specified. Defendant Rodney Smith uses his own documentation, and provides documentation similar to that noted above for defendant Bryant.

7

☐    I elect to receive **$1,900.97** per month for the remainder of my life. After my death, if my spouse survives me, payments of **$950.49** per month will be made for the remainder of (his/her) life. . . . The relative value of this benefit to the Single Life Annuity is **100%.**

(AR 204; <u>see also</u> DE 131-1 (defendant Rodney Smith)).

Each defendant elected to receive the immediate lump sum distribution specified in their initial distribution letter. (<u>E.g.</u> AR 212; <u>see</u> DE 126 ¶29; DE 80 ¶29; DE 57 ¶8; DE 131-1 at 2). After receiving these elections, between October 4, 2013, and November 15, 2013, the Plan made a lump sum distribution (hereinafter "initial lump sum distribution") to each defendant in the amount specified in the initial Lump Sum Application. (<u>E.g.</u> AR 198; <u>see</u> DE 126 ¶30; DE 80 ¶30; DE 57 ¶9).

On December 5, 2013, plaintiff Transamerica sent each defendant a letter informing them of an error in the amount of their initial lump sum distribution (hereinafter the "December 5, 2013, correction letter(s)") (<u>E.g.</u> AR 220-21; <u>see</u> DE 126 ¶39; DE 80 ¶39; DE 57 ¶13; DE 131-2). Apart from the dollar amounts referenced, the text of the December 5, 2013, correction letters sent to each defendant used identical form language. (<u>See</u> <u>id.</u>). By way of example, the letter to defendant Bryant provides in pertinent part as follows:

Transamerica . . . is contacting you because it has come to our attention during an audit of our benefit calculation systems that the lump sum payment you received was overstated. Instead of the lump sum amount of $366,427.80 which you received through an IRA rollover, your lump sum benefit should have been $230,803.24 Accordingly, the amount of your lump sum overpayment is equal to $135,624.56. Please note that we have informed DAK of this issue and will keep them fully apprised throughout this corrective process.

Under the federal law known as ERISA . . . the Plan's fiduciaries are responsible for protecting the interests of all participants and beneficiaries. To that end, the overpayment amount you received in error must be recovered by the Plan. . . . We request that you immediately return the overpayment made to you in the amount of $135,624.56 via a check made payable to Transamerica . . . We can also accept an

electronic transfer from your IRA provider.

Please be aware that there are significant negative tax consequences to you if you do not promptly repay the overpayment amount. The overpayment amount is not eligible for rollover into an IRA, and therefore the overpayment amount is subject to income taxes as well as an additional 6% excise tax if not removed from your IRA on a timely basis. . . .

If we do not hear from you within 15 days from the date of this letter, we will be obligated to pursue this as a collection matter.

Enclosed is a revised retirement election package which shows the corrected lump sum amount and your other payment options should you choose to return the entire lump sum amount and elect an alternative form of payment.

(AR 220-21; <u>see also</u> DE 131-2 (defendant Rodney Smith)). Enclosed with the December 5, 2013, correction letter is a revised distribution letter with "Lump Sum Application" (hereinafter "revised Lump Sum Application") that is identical in all respects to the initial Lump Sum Application, with the following changes made:

(1)     Instead of providing 60 days following last day of employment to make an election, the revised Lump Sum Application provides each participant "60 days from the date of this letter to elect the lump sum payment." (<u>E.g.</u>, AR 222).[14]

(2)     Instead of stating that payment will be valued as of October 1, 2013, and processed on or about that date, the revised Lump Sum Application states that "payment will be valued as of November 1, 2013," and "processed as soon as your election form has been reviewed and deemed in good order."

---

[14] In conjunction with this change, plaintiffs amended the Plan through a new Amendment No. Two, which restates section 4.15 in terms identical to Amendment One, except that instead of providing that each participant shall have the option to elect to receive an immediate lump sum distribution "within 60 days following such severance from service," it provides "within 60 days following distribution to the Participant of a proper election form." (AR 2-3).

(Id.).  It further states that "[t]his election package replaces any previous election package you may have received."  (Id.).

(3)    Instead of stating the value of the initial lump sum distribution, the revised Lump Sum Application states the lump sum value as stated in the December 5, 2013, correction letters.  For example, defendant Bryant's letter states "[t]he lump sum value of your accrued pension benefit under the Plan as of October 1, 2013 is equal to: $230,803.24."  (Id.).

The revised Lump Sum Application contains a form substantially similar to the initial Lump Sum Application form, in multiple sections for making elections between various distribution options.  Section E "Forms of Benefit," describes the election options and the dollar amounts of the lump sum payout and annuity options.  Section E of the revised Voluntary Lump Sum Application is identical in all respects to the initial Voluntary Lump Sum Application, except that the dollar amount provided for the lump sum payment is the value as stated in the December 5, 2013, correction letter.  For example, the revised form for defendant Bryant specifies amounts for the first three of nine election options as follows:

**Special One-Time Lump Sum Payout**

☐    I elect to receive the present value of my accrued benefit equal to **$230,803.24** in one payment. . . . The relative value of this benefit to the Single Life Annuity is **100%.**

**Single Life Annuity** (Normal form of payment if you are not married)

☐    I elect to receive **$1,918.43** per month for the remainder of my life.  When I die payments will stop. . . .

**50% Joint and Survivor Annuity** (Normal form of payment if you are married)
. . .

10

☐    I elect to receive **$1,900.97** per month for the remainder of my life.  After my death, if my spouse survives me, payments of **$950.49** per month will be made for the remainder of (his/her) life. . . . The relative value of this benefit to the Single Life Annuity is **100%.**

(AR 225; <u>see also</u> DE 131-2 at 6 (defendant Rodney Smith)).

On December 16, 2013, Transamerica sent each defendant a letter providing further explanation regarding the revised lump sum calculations (hereinafter the "December 16, 2013, explanation letter(s)").  The December 16, 2013, explanation letter provides a statement as to the participant's "TOTAL MONTHLY <u>ACCRUED BENEFIT</u> PAYABLE AT NRD [<u>Normal Retirement Date</u>]," and the "Lump Sum Payable at BCD [Benefit Commencement Date, or October 1, 2013]."  For example, for defendant Bryant, the December 16, 2013, letter states that his TOTAL MONTHLY <u>ACCRUED BENEFIT</u> PAYABLE AT NRD [<u>Normal Retirement Date</u>]" is $1,918.43, and his "Lump Sum Payable at BCD" is $230,803.24. (AR 232).

The December 16, 2013, explanation letter then provides the following explanation regarding the discrepancy between the initial lump sum calculation and the revised lump sum calculation:

The Lump Sum shown above is based on your age at your Benefit Commencement Date (BCD) and is equal to the actuarial present value (at your BCD) of your Total Monthly <u>Accrued Benefit</u> **commencing at your NRD**.

The original Lump Sum was calculated as the actuarial present value (at your BCD) of your Single Life Annuity as shown in Section E of your Retirement Benefit Application, **commencing at your BCD**.

(AR 233; <u>see also</u> DE 139-7 (defendant Rodney Smith)) (emphasis in original).

The December 16, 2013, explanation letter also provides "updated relative value information," and states "[b]ecause your Lump Sum was revised, we are also providing you with updated relative value information (prior values are shown in Section E of your Retirement Benefit Application)."  (<u>Id.</u>).  The December 16, 2013, letter then includes a chart showing that the relative

value of the revised Lump Sum payment is substantially lower than the Single Life Annuity. (Id.). For example, for defendant Bryant, the relative value specified is 63%, and for defendant Rodney Smith, the relative value specified is 66%. (Id.).

In summary, the chart below depicts the initial and revised lump sum amounts, along with the alleged overpayments requested to be repaid, by defendant group:

| Defendant Name | Initial Lump Sum | Revised Lump Sum | Alleged Overpayment |
|---|---|---|---|
| *Baker defendants* | | | |
| Allen | $61,235.73 | $52,595.47 | $8,640.26 |
| Bass | $320,538.88 | $211,168.11 | $109,370.77 |
| Bellamy | $120,025.81 | $90,258.11 | $29,767.70 |
| Bryant | $366,427.80 | $230,803.24 | $135,624.56 |
| Galloway | $325,570.55 | $209,659.91 | $115,910.64 |
| M. Smith | $335,347.11 | $227,231.96 | $108,115.15 |
| Webb | $338,044.72 | $222,700.80 | $115,343.92 |
| *Ward defendants* | | | |
| Brewer | $494,632.93 | $324,017.70 | $170,615.23 |
| Corbett | $315,381.86 | $216,103.11 | $99,278.75 |
| Garrison | $515,924.55 | $300,002.41 | $215,922.14 |
| Holland | $388,069.02 | $230,896.32 | $157,172.70 |
| Nelson | $376,095.86 | $317,148.07 | $58,947.79 |
| Rhodes | $630,511.73 | $437,287.44 | $193,224.29 |
| Sellers | $352,462.18 | $210,013.96 | $142,448.22 |
| | | | |
| Rodney Smith | $554,638.72 | $363,325.52 | $191,313.20 |

(See DE 1-2; DE 156-5; AR 220).

After December 16, 2013, the responses of each defendant varied. As noted previously, the Baker defendants, upon advice of counsel, returned the alleged overpayments, whereas the Ward defendants and defendant Rodney Smith did not. The Baker defendants engaged in an administrative claims process with plaintiffs whereby the Baker defendants sought recovery of the original lump sum payment amounts. (See AR 123-588).

## DISCUSSION

A.      Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must

13

be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted).  Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture."  Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005).  By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied.  Id. at 489-90.

B.      Analysis

1.      Plaintiffs' Equitable Restitution Claim

In their equitable restitution claim, plaintiffs seek to recover alleged overpayments remaining in possession and control of defendants, pursuant to ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3).  To establish a right to equitable restitution under ERISA, plaintiffs must show that they are seeking to recover property that (1) is specifically identifiable; (2) belongs in good conscience to the plan; and (3) is within the possession and control of defendants.  See Sereboff v. Mid Atl. Med. Servs., Inc., 547 U.S. 356, 363 (2006); Great-W. Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 213 (2002).

As a preliminary matter, a portion of plaintiffs' summary judgment motion on its equitable restitution claim is moot because the Baker defendants already voluntarily returned the alleged overpayments made to them.  (See AR 199; 000238; 000276; 000359; 000411; 000465; 000515;

000558). Where the Baker defendants have returned the alleged overpayments, those overpayments are not in the possession and control of the Baker defendants. Therefore, no claim of equitable restitution remains against the Baker defendants, and this portion of plaintiffs' summary judgment motion on their equitable restitution claim is DISMISSED AS MOOT. The dispute that remains on plaintiffs' claim pertains to the Ward defendants and defendant Rodney Smith, as reflected in the parties' briefing.

With respect to plaintiffs' claim against the Ward defendants and defendant Rodney Smith, it is undisputed that the alleged overpayments are specifically identifiable funds within the possession and control of defendants, as ensured through the court's preliminary injunction order. (See DE 45). The parties dispute, however, whether the alleged overpayments constitute property belonging in good conscience to the Plan, with plaintiffs contending that the plain language of the Plan did not authorize the alleged overpayments and defendants contending that the plain language of the Plan required payment of the alleged overpayments.[15] The instant dispute thus turns upon the correct interpretation of the Plan.

Where ERISA was enacted "to protect contractually defined benefits," interpretation of benefits plans is governed by contract principles. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989). "[A]s a general proposition, ERISA plans, as contractual documents, are interpreted de novo by the courts, which conduct their review without deferring to either party's interpretation." Booth v. Wal-Mart Stores, Inc. Associates Health & Welfare Plan, 201 F.3d 335,

---

[15] Defendant Rodney Smith also opposes plaintiffs' equitable restitution claim on the basis that plaintiffs are seeking legal rather than equitable relief, under 29 U.S.C. § 1132(a)(3), renewing his argument asserted in support of his motion to dismiss. (See DE 139 at 27 n.3; DE 55 at 5-12). This argument is premised, however, on the assertion that the unambiguous language of the Plan does not provide a basis for holding that the alleged overpayments belong in good conscience to the plan. (See id.). As discussed in the text above, this is the determinative issue remaining for plaintiffs' claim against the Ward defendants and defendant Rodney Smith.

15

340 (4th Cir. 2000) (quotations omitted). "We interpret an ERISA health insurance plan under ordinary principles of contract law, enforcing the plan's plain language in its ordinary sense." Wheeler v. Dynamic Eng'g, Inc., 62 F.3d 634, 638 (4th Cir. 1995).

"To the extent the administrator enjoys discretion to interpret the terms of a plan in the course of making a benefits-eligibility determination, such interpretive discretion applies only to ambiguities in the plan." Blackshear v. Reliance Standard Life Ins. Co., 509 F.3d 634, 639 (4th Cir. 2007). "[D]iscretionary authority is not implicated where the terms of the plan itself are clear," and [a]n administrator's discretion never includes the authority to read out unambiguous provisions contained in an ERISA plan." Id. (quotations omitted).

Applying these principles here, the December 5, 2013, lump sum distribution calculations were authorized by the unambiguous terms of the Plan, while the initial alleged overpayments were not. In reaching this determination, the court begins with consideration of the structure of the Plan as a whole, including those provisions of the Plan present prior to Amendment One. The court next turns to analysis of Amendment One and its application to defendants.

The Plan, including amendments through December 26, 2013, is a 122 page document divided into 14 articles. (See AR 1-122). Article II provides definitions of capitalized terms referenced in the Plan, including, as relevant here, "Accrued Benefit," "Actuarially Equivalent," "Early Retirement Benefit," and "Normal Retirement Benefit." (AR 6-7). Article IV sets forth provisions for determination of "Benefits," including "Normal Retirement," and "Early Retirement." (AR 7).

With respect to eligibility for a Normal Retirement Benefit, Section 4.1 of the Plan provides that "[a] Participant who has attained Normal Retirement Age shall be fully vested in and eligible

16

to receive a <u>Normal Retirement Benefit</u> at his <u>Normal Retirement Date</u>." (AR 40). For computation of the <u>Normal Retirement Benefit</u>, the Plan provides that the <u>Normal Retirement Benefit</u> "shall be a life annuity equal to the sum of" several detailed factors taking into account years of service and average compensation. (<u>Id.</u>).

For example, to determine computation of the <u>Normal Retirement Benefit</u> for defendant Bryant,[16] his <u>Normal Retirement Date</u> is February 1, 2020, the "first day of the month coinciding with or next following" his 65th birthday. (AR 26; AR 232). Under section 4.1, defendant Bryant's <u>Normal Retirement Benefit</u> is a life annuity commencing on that date, in an amount based on his years of service (32.49723) and average compensation ($4,779.20), yielding the amount of $1,918.43 per month commencing February 1, 2020. (<u>Id.</u>).[17]

With respect to eligibility for an <u>Early Retirement Benefit</u>, section 4.3 of the Plan provides that "[a] Participant who has attained <u>Early Retirement Age</u> shall be fully vested in and eligible to elect to receive <u>Early Retirement Benefits</u> payable beginning at his <u>Early Retirement Date</u> if his employment is terminated on or after his <u>Early Retirement Age</u>." (AR 42). For computation of the <u>Early Retirement Benefit</u>, the Plan provides that such benefit "shall be his <u>Accrued Benefit</u> determined at his <u>Early Retirement Date</u> payable at the Participant's election either (i) as a monthly benefit beginning at his <u>Normal Retirement Date</u>, or (ii) as a monthly benefit beginning on or after his <u>Early Retirement Date</u> reduced based on the Participant's age when benefits begin and Years of

---

[16] Plaintiffs and the Ward defendants use defendant Bryant as an example (even though counsel for the Ward defendants are not representing defendant Bryant) to illustrate application of the Plan provisions. (<u>E.g.</u> DE 115 at 18; DE 179 at 8). Where the principles of application are the same for all defendants, the court for ease of reference also uses defendant Bryant as an example.

[17] Specifically, the formula in section 4.1 applies to defendant Bryant's circumstances as follows. 1.2 percent of defendant Bryant's Final Average Compensation ($4,779.20) multiplied by years of service before January 1, 2006, (32.49723), equals $1,863.73. (<u>See</u> AR 232). To that amount is added 1.2 percent of 2006 Compensation, or $54.70, yielding a total Normal Retirement Benefit of $1,918.43 monthly. (<u>See</u> <u>id.</u>).

Service for vesting in accordance with" a table in section 4.3 (AR 42-43). The form of payment of the Early Retirement Benefit "shall be governed by the same rules as in the case of Normal Retirement under Section 4.1," that is, a monthly annuity. (AR 46; see AR 40-41).

As with the Normal Retirement Benefit, the parties do not dispute the eligibility and correct computation of the Early Retirement Benefit for each of the defendants. For example, defendant Bryant, who was 58 upon termination in 2013 with over 32 years of service, was fully vested in and eligible to elect an unreduced Early Retirement Benefit, because, according to the table at section 4.3(b), he had surpassed 27 years of service and 58 years age required for such full vesting. Thus, he was eligible to elect to receive a monthly annuity in the same monthly amount as the Normal Retirement Benefit, $1,918.43, beginning on the Early Retirement Date, October 1, 2013. (See AR 42-43).

The court turns next to the impact of Amendment One on the benefits available for election by each defendant, which the parties sharply dispute. Amendment One provides for the addition of a new Section 4.15, that states, in pertinent part that each participant terminated as a result of the closing of the Cape Fear facility shall "have the option to elect to receive an immediate lump sum distribution within 60 days following such severance from service." (AR 3). "Such lump sum shall be Actuarially Equivalent to the Cape Fear Participant's Accrued Benefit." (Id.). In this manner, the amendment is to be read in conjunction with existing sections in Article IV, and the definitions in Article II.

Applying such existing sections and definitions, a participant's "Accrued Benefit" is defined as "[t]hat portion, at any given date, of a Participant's Normal Retirement Benefit that has accrued at such date." (AR 12) (emphasis added). In turn, the Normal Retirement Benefit is "[t]he benefit

18

payable at the Normal Retirement Date, as described in Section 4.1." (AR 26). As set forth above, the benefit payable at the Normal Retirement Date, as described in Section 4.1, is a life annuity commencing on the first day of the month coinciding with or next following a participant's 65th birthday. (See AR 26, 40). Thus, in the case of defendant Bryant, for example, his Accrued Benefit is a monthly annuity of $1,918.43, commencing on February 1, 2020.

Amendment One provides that the immediate lump sum payment "shall be Actuarially Equivalent" of that Accrued Benefit. (AR 3). To calculate the "Actuarial Equivalent" of the Accrued Benefit, the Plan instructs calculation of "[a] benefit of equivalent cost value, determined as of the date the computation is effective," using the mortality assumption tables and interest rate assumptions set forth in the Plan. (AR 12). Thus, in the case of defendant Bryant, the Actuarial Equivalent of a monthly annuity of $1,918.43, commencing on February 1, 2020, is **$230,803.00**. (AR 235, 319).[18]

This amount, $230,803.00, is thus the correct amount of lump sum payment authorized by the Plan, corresponding to the amount communicated to defendant Bryant as the corrected lump sum amount, on December 5, 2013. The amount communicated on September 30, 2013, **$366,428.00**, and distributed thereafter, by contrast, was not authorized by the Plan. The incorrect amount is the result of determining the Actuarial Equivalent of a monthly annuity of $1,918.43, commencing October 1, 2013, or defendant Bryant's Early Retirement Date. (See, e.g., AR 234, 316). Because

---

[18] The parties do not dispute the calculation of a lump sum actuarially equivalent to a monthly annuity commencing February 1, 2020. Indeed, the calculation itself is illustrated in exhibits submitted in part by defendants' expert, Roth, during the course of administrative proceedings. (See AR 314-327). While the calculations in those submissions provide a figure slightly below the lump sum amounts communicated and distributed in the case of each defendant, the difference is due to the fact that the submissions for illustrative purposes show the actuarial equivalent amount by year, whereas the actuarial equivalent amount is calculated by each month in practice, and as actually communicated to defendants here. (See id.; see DE 179 at 9).

the Plan does not authorize calculation of the immediate lump sum payment in that manner, the excess amount communicated and distributed to defendants in good conscience belongs to the Plan and must be returned to the Plan.

Defendants raise several arguments in favor of a different interpretation of Amendment One, all of which are unavailing in light of the plain language of the Plan. Defendants argue that because they were all eligible to receive an Early Retirement Benefit in the form of a single life annuity commencing October 1, 2013, then it follows that the Actuarial Equivalent of that single life annuity must be calculated using the same benefit commencement date of October 1, 2013. (See, e.g., DE 115 at 19). Amendment One, however, does not provide for payment of a lump sum that is Actuarially Equivalent to a participant's Early Retirement Benefit. Rather, it provides for payment of a lump sum that is Actuarially Equivalent to a participant's Accrued Benefit, which in turn is defined as a participant's Normal Retirement Benefit. (AR 3, 12).

Nevertheless, defendants point out that a participant's Accrued Benefit is one of the elements of a participant's Early Retirement Benefit. Section 4.3 provides, in pertinent part, that "a Participant's Early Retirement Benefit shall be his Accrued Benefit determined at his Early Retirement Date payable at the Participant's election either (i) as a monthly benefit beginning at his Normal Retirement Date, or (ii) as a monthly benefit beginning on or after his Early Retirement Date . . . ." (AR 42). Thus, defendants suggest, all participants who had qualified for an Early Retirement Benefit, including all defendants here, should have their Accrued Benefit defined only by reference to the Early Retirement Benefit provisions. (See, e.g., DE 115 at 18).

But, again, neither Amendment One nor Section 4.3 of the Plan require such an approach. While an Early Retirement Benefit is defined by reference to a participant's Accrued Benefit, it does

20

not follow that <u>Accured Benefit</u> must be defined by reference to the <u>Early Retirement Benefit</u>. Section 4.3 does not change the definition of a participant's <u>Accrued Benefit</u> (e.g., a participant's <u>Normal Retirement Benefit</u>, a monthly annuity; for defendant Bryant, a monthly annuity in the amount of $1,918.43), but rather changes when such <u>Accrued Benefit</u> may start being paid for a qualifying participant (e.g., at the <u>Early Retirement Date</u> instead of <u>Normal Retirement Date</u>; for defendant Bryant, on October 1, 2013, instead of February 1, 2020). Amendment One, by contrast, in establishing a lump sum payment, does not alter the definition of <u>Early Retirement Benefit</u>, <u>Normal Retirement Benefit</u>, or <u>Accrued Benefit</u>. It does not change, for example, Section 4.3 to allow for the <u>Early Retirement Benefit</u> to be "payable . . . (iii) as an immediate lump sum payment on his Early Retirement Date." Amendment One conceivably could have done so to provide such a lump sum payout, but it did not. Rather, Amendment One provided for an immediate lump sum payment only by reference to the <u>Accrued Benefit</u>, and in turn the <u>Normal Retirement Benefit</u>.

Defendants also argue that plaintiffs' interpretation of the Plan deprives defendants of the Early Retirement Benefit that they all were eligible to receive. (DE 115 at 24). As such, they argue, plaintiffs' interpretation would result in an impermissible reduction of an accrued benefit, in violation of ERISA's "anti-cutback" rule. (<u>Id.</u> at 25 (quoting <u>Central Laborers' Pension Fund v. Heinz</u>, 541 U.S. 739, 741 (2004))). The premise of this argument, however, is flawed. Nothing in Amendment One takes away defendants' entitlement to receive their <u>Early Retirement Benefit</u> precisely as guaranteed by the Plan, under Section 4.3, in the form of a single life annuity beginning on their <u>Early Retirement Date</u>. Thus, Amendment One does not violate the "anti-cutback" rule by resulting in "suspension of payment of early retirement benefits already accrued." <u>Central Laborers' Pension Fund</u>, 541 U.S. at 741.

Defendants argue that the third sentence in Amendment One provides context to further support their interpretation, where it provides "[a]ny such Cape Fear Participant who has not yet reached his <u>Early Retirement Age</u> also shall have the option to receive an actuarially equivalent . . . immediate annuity payable in the form of a <u>Qualified Joint and Survivor Annuity</u> or a <u>Joint and Survivor Annuity</u> . . . ." (AR 3) (hereinafter the "third sentence in Section 4.15"). Defendants suggest that, if the lump sum distribution is based on the benefit payable at <u>Normal Retirement Date</u>, as plaintiffs contend, then "there would be no reason to include a sentence stating that a participant 'who has not yet reached <u>Early Retirement Age</u>' is entitled to some form of an immediate annuity because Amendment [One] already states that the lump sum distribution is an 'immediate' benefit." (DE 171 at 7). The only reason to refer to <u>Early Retirement Age</u>, defendants argue, is because it is implied by the second sentence in Section 4.15 that the <u>Early Retirement Benefit</u> is to be part of the lump sum calculation. (<u>See</u> <u>id.</u>).

The third sentence in Section 4.15, however, serves an independent purpose. Without that sentence, someone who has not reached <u>Early Retirement Age</u> would have been entitled only to a lump sum distribution (as specified in Amendment One) or to an annuity payable far in the future at their <u>Normal Retirement Date</u> (as provided in the Plan, Section 4.1(a)). (<u>See</u> AR 3, 40). With that sentence, by contrast, Amendment One ensures that all participants, even those who had not yet reached <u>Early Retirement Age</u>, will be entitled to receive an annuity payable immediately commencing upon severance with DAK. That annuity, for those participants, is specified to be actuarially equivalent of the lump sum distribution for those participants. (AR 3). In sum, the third sentence in Section 4.15 stands on its own terms, plainly defined in the Plan, and the inference suggested by defendants is thus unnecessary and unwarranted.

22

By reference to expert opinions, defendants also argue that, as aided by the interpretation of such experts, the Plan must be read to provide for Actuarial Equivalent of the Early Retirement Benefit as opposed to the Normal Retirement Benefit. For example, the Ward defendants and defendant Rodney Smith reference the testimony and reports of Gaston, which include the opinion that "[t]he Accrued Benefit and the Normal Retirement Benefit are distinct concepts under the Plan," and thus the "actuarial equivalent of the Accrued Benefit and actuarial equivalent of the Normal Retirement Benefit are two different things." (DE 140; see DE 115 at 28; DE 139 at 16). Similarly, Roth opines that "the correct lump sum retirement amounts of the Cape Fear Participants must include the early retirement subsidy which is an accrued Benefit Right or Feature of the DAK Plan." (DE 150 at 2).

But, where the language of the Plan is unambiguous, recourse to expert opinions is unnecessary and not relevant to Plan interpretation. See Booth, 201 F.3d at 340; Wheeler, 62 F.3d at 638. In any event, the interpretations offered by experts, adopted in turn by defendants, are contrary to the plain language of the Plan. To reach their interpretation, the experts conflate the concept of the various benefits that each participant has "accrued," in the generic sense of the term, which may include entitlement to both a life annuity commencing at Normal Retirement Age and Early Retirement Age, with the specific Plan term "Accrued Benefit," which is more precisely and narrowly defined. Indeed, in the final paragraph of his expert opinion letter, Roth uses the term "accrued" three times in this generic sense, while not once referencing the operable term "Accrued Benefit," or its actual definition in the Plan. (See DE 150 at 2). While each defendant accrued an Early Retirement Benefit in the form of a life annuity commencing in 2013 as a result of their years of service, that Early Retirement Benefit does not constitute their Accrued Benefit, as specifically

23

defined in the Plan.[19]

Defendants contend that plaintiffs' interpretation of Amendment One "would conflict with the principle that if the lump sum distribution is not going to include the early retirement benefit, or some other benefit under the plan, it must clearly state so." (DE 171 at 8). Defendants cite to the Advisory Council to U.S. Department of Labor, November 2013, report for this proposition. (See id. (citing DE 142)) (hereinafter "Advisory Council Report"). Defendants' argument is flawed, however, because nothing in ERISA requires the Plan amendment to be drafted to expressly state that the lump sum distribution does not include an Early Retirement Benefit under the Plan. In addition, the Advisory Council Report does not state that such language is required, only that it is recommended. (See Advisory Council Report at 3). The court's role with respect to plaintiffs' claim is to interpret the Plan in accordance with its unambiguous language, not to conform the Plan to industry best practices. See US Airways, Inc. v. McCutchen, 133 S. Ct. 1537, 1546, 185 L. Ed. 2d 654 (2013) (stating that the court must "declin[e] to apply rules – even if they would be 'equitable' in a contract's absence – at odds with the parties' expressed commitments"); Firestone, 489 U.S. at 113; Blackshear, 509 F.3d at 639.

For the same reasons, similarly unavailing is defendant Rodney Smith's argument that "[u]nder industry standards and best practices, a retirement plan's administrators must follow an established practice under the Plan." (DE 139 at 16). Defendant Rodney Smith suggests that, where

---

[19] Plaintiffs move to exclude the reports and testimony of Gaston and Roth. (DE 157). The court has considered the reports and testimony of Gaston and Roth to the extent set forth herein for purposes of summary judgment motion. Some of the materials included with the reports are useful in comparing and illustrating the competing calculations proposed by the parties, (e.g., AR 234-35; DE 159-5 at 4-7, 10, 13), but otherwise the testimony and reports are not relevant to the issue of plan interpretation, as discussed in the text above. In light of the court's disposition of the other motions, therefore, plaintiffs' motion to exclude is DENIED AS MOOT.

plaintiffs already interpreted the Plan previously by calculating the lump sum amount as <u>Actuarially Equivalent</u> to the <u>Early Retirement Benefit</u>, they should not be permitted to unilaterally adopt an inconsistent practice. The Plan, however, must be interpreted in accordance with its plain language, not based on the prior practice of the administrator. <u>See</u> <u>Booth</u>, 201 F.3d at 340; <u>Wheeler</u>, 62 F.3d at 638. Where an administrator has made an error in interpreting the Plan previously, the remedy is not to require the administrator to continue the mistaken interpretation, but rather to allow the administrator to correct the mistake, as here. <u>See, e.g.</u>, <u>Conkright v. Frommert</u>, 559 U.S. 506, 513 (2010) (rejecting a "'one-strike-and-you're-out' approach" "where the administrator has previously construed the same plan terms and [the court] found such a construction to have violated ERISA").

Finally, defendants cite a number of employee statements regarding the calculation of the lump sum payment and summarizing the plan terms in support of their interpretation of the Plan. For example, defendants cite to testimony of Andrew Lumb ("Lumb"), a former employee of plaintiff Transamerica who was responsible for interpreting Amendment One and providing directions to a team of employees generating a program for calculating the lump sum payments. Defendants note that Lumb initially prepared in July 2013 a "scoping and requirement document" that referred to the lump sum payment as "[a]n unlimited immediate lump sum." (DE 115-1 at 15 (Lumb. Dep. at 55); DE 128 at 5 (Lumb Dep. Ex. 7 at 14)). In addition, defendants note that Eammon Simmons, Senior Manager of Compensation and Benefits at DAK, asked Lumb in an email whether an employee who is not "retiree eligible" can take the lump sum, "[w]ith obvious ERF's [early retirement factors] applied," to which Lumb responded "Right. They get an actuarial equivalent amount." (DE 129 (Lumb Dep. Ex. 9)). Similarly, Lumb's supervisor, Alison Katz ("Katz") addressed an issue with the formula being used for the lump sum calculation, in a

25

September 12, 2013, email to Lumb, and questioned whether her proposed fix "would miss out on including the ERF [early retirement factor] subsidy in the values." (DE 133 (Lumb Dep. Ex. 10)). Finally, Lumb and his team generating lump sum calculations, as late as October 30, 2013, verified the results of the calculations in at least two different computer programs, without raising any questions as to the formula used. (See DE 115-1 at 24 (Lumb Dep. at 91-92); e.g. id. Ex. 18).

Defendants suggest that these statements demonstrate the view of these employees that Amendment One requires an interpretation that provides for calculation of the lump sum payment by reference to the Early Retirement Benefit. As an initial matter, however, apart from Lumb, there is no evidence that any of these individuals read Amendment One and the corresponding passages in the Plan. In any event, even assuming all these employees interpreted Amendment One in the manner urged by defendants, such evidence is not relevant to the court's determination of the correct interpretation of the Plan. Where the terms of the Plan are unambiguous, the court must ensure that those terms are "interpreted de novo . . . without deferring to either party's interpretation." Booth, 201 F.3d at 340.

In sum, the alleged overpayments belong in good conscience to the Plan and must be returned to the Plan. As such, plaintiffs' motion for summary judgment on its equitable restitution claim against the Ward defendants and defendant Rodney Smith must be granted, and its claim against the Baker defendants, who have already returned the alleged overpayments, must be dismissed in that part as moot.

  2.  Defendants' Equitable Counterclaims and Defenses

    i.  Premised on Plan Interpretation

Defendants assert certain counterclaims and defenses, and arguments in support thereof,

premised on the proposition that their interpretation of the Plan is correct. For example, the Ward defendants claim entitlement to an equitable surcharge remedy on the basis that plaintiffs: "[sought] repayment . . . when such repayment *is not justified by the Plan*," and "[t]hreaten[ed] the Defendants and us[ed] other scare tactics to try to get the Defendants to return *their accrued benefits*." (DE 171 at 17) (emphasis added). They assert a constructive fraud claim on the basis that plaintiffs "sought repayment by the Defendants of their accrued benefits *when such repayment is not justified by the Plan documents*," and used "scare tactics" to get defendants to return *their accrued benefits* that each Defendant *properly earned*." (Id. at 21) (emphasis added). Defendant Rodney Smith also asserts a defense to plaintiffs' equitable restitution claim on the basis that he was not "unjustly enriched," where he "*received exactly what he was due under the Plan* – and therefore was not enriched." (See DE 139 at 19-20).

These arguments are, as denoted by the emphasized text, based on the premise that defendants' interpretation of the Plan is correct and that the Plan authorized distribution of the alleged overpayments to them in the first place. Where, however, the court now has determined that the Plan unambiguously requires the interpretation asserted by plaintiffs, and that the Plan only authorized lump sum distributions in the amounts communicated to defendants in December 2013, those counterclaims and defenses on the basis of a contrary interpretation must be dismissed as a matter of law.

Similarly, counterclaims and defenses asserted by the Baker defendants, also premised on their interpretation of the Plan, must be dismissed for the same reason. For example, the Baker defendants state they are entitled to an equitable surcharge remedy on the basis of "Plaintiffs' breach of fiduciary duty *in failing to follow the express terms of the Plan*" in the manner defendants now

assert is correct. (DE 169 at 11) (emphasis added). The Baker defendants also state they are entitled

to recover benefits due them, under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), on the basis

that "[i]t was an abuse of discretion by Plaintiffs to calculate the lump sum payout due these

Defendants by using the <u>Normal Retirement Date</u> instead of the <u>Early Retirement Date</u>." (<u>Id.</u>).

These counterclaims and defenses now asserted by the Baker defendants, both premised only on

their interpretation of the Plan, must be dismissed in their entirety.

    ii.    Premised on Plaintiffs' Conduct

Putting aside those counterclaims and defenses based on defendants' interpretation of the

Plan, the court now turns to those counterclaims and defenses premised upon the conduct of

plaintiffs, notwithstanding that the corrected lump sum distribution calculations were required by

the language of the Plan. Defendants assert several theories of equitable relief premised on

plaintiffs' conduct in communicating initially incorrect lump sum amounts to defendants. The court

will address each in turn.

    a.  Equitable Estoppel

Defendants argue that plaintiffs should be equitably estopped from relying on its corrected

lump sum calculations, due to plaintiffs's own initial misrepresentations and conduct in negligently

calculating, communicating, and making the incorrect lump sum distributions. Plaintiffs have

moved for summary judgment on the equitable estoppel counterclaims, and plaintiffs have opposed

defendants' arguments asserting equitable estoppel as an affirmative defense.[20]

---

[20] As noted in the court's statement of the case, the Baker defendants asserted equitable estoppel as a counterclaim, whereas the Ward defendants and defendant Rodney Smith asserted equitable estoppel as an affirmative defense to plaintiffs' claim for equitable restitution. Although the Ward defendants fault plaintiffs for failing to move for summary judgment on their affirmative defense of equitable restitution, plaintiffs were not required to do so. The burden is on the Ward defendants to demonstrate a triable issue based on an affirmative defense to plaintiffs' claim. See, e.g., Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 590 (1994); Grunley Walsh U.S., LLC v. Raap, 386 F. App'x

The standard for an equitable estoppel claim in the ERISA context has not been made clear under Fourth Circuit law. In CIGNA Corp. v. Amara, 131 S.Ct. 1866, 1878-80 (2011), the Supreme Court recognized that equitable estoppel may be available as a basis for obtaining "appropriate equitable relief" under ERISA § 502(a)(3). The court described equitable estoppel in conjunction with two other "traditional equitable remedies," surcharge and reformation. Amara, 131 S.Ct. at 1879. "Equitable estoppel operates to place the person entitled to its benefit in the same position he would have been had the representations been true." Id. at 1880 (quotations omitted). "[E]quitable estoppel forms a very essential element in fair dealing, and rebuke of all fraudulent misrepresentation, which it is the boast of courts of equity constantly to promote." Id. (quotations omitted). "[W]hen equity courts used the remedy of estoppel, they insisted upon a showing akin to detrimental reliance, i.e., that the defendant's statement in truth, influenced the conduct of the plaintiff, causing prejudice." Id. at 1881 (quotations omitted).

The Supreme Court in Amara did not further discuss equitable estoppel, or its application. See id. at 1881-82. After Amara, the Fourth Circuit confirmed the availability of equitable estoppel as a basis for a claim under ERISA § 502(a)(3), in McCravy v. Metropolitan Life Insurance Company, 690 F.3d 176, 182 (4th Cir. 2012), but it did not delineate its elements in the context of an ERISA claim. In addition, the court in McCravy "recognize[d] that [the Fourth Circuit] had previously indicated, e.g., in Coleman v. Nationwide Life Insurance Co., that equitable estoppel is of limited applicability in ERISA cases." McCravy, 690 F.3d at 182 n.4 (citing Coleman v. Nationwide Life Ins. Co., 969 F.2d 54 (4th Cir. 1992)).

_____

455, 459 (4th Cir. 2010); Herndon v. Massachusetts Gen. Life Ins. Co., 28 F. Supp. 2d 379, 382 (W.D. Va. 1998). Where issues regarding application of the defense to all defendants have been adequately raised in the briefs before the court, those issues are ripe for decision as a matter of law.

In Coleman, the Fourth Circuit recognized a "prohibition against using equitable estoppel to modify the written terms of a plan," where the plan terms "unambiguously" foreclose the benefits sought by the plaintiff. 969 F.2d at 59. Since Amara, other circuits likewise have recognized such a limitation to equitable estoppel in the context of an ERISA claim. For example, the Ninth Circuit recently noted "a plaintiff may not bring an equitable estoppel claim that would result in a payment of benefits that would be inconsistent with the written plan, or would, as a practical matter, result in an amendment or modification of a plan." Gabriel v. Alaska Elec. Pension Fund, 773 F.3d 945, 956 (9th Cir. 2014) (quotations omitted). "For the same reason, oral agreements or modifications cannot be used to contradict or supersede the written terms of an ERISA plan." Id.; see Rodrigue v. W. & S. Life Ins. Co., 948 F.2d 969, 971 (5th Cir. 1991) ("ERISA's writing requirement protects the plan's actuarial soundness by preventing plan administrators from contracting to pay benefits to persons not entitled to them under the express terms of the plan.").

Here, the incorrect initial distribution letters did not provide an interpretation of any ambiguous terms in the Plan, but rather provided information as to the amount of the lump sum distribution each defendant could elect to receive, which was erroneous under the terms of the Plan. In these circumstances, defendants may not bring an equitable estoppel counterclaim because it would result in payment of benefits inconsistent with the written Plan, and it would result as a practical matter in modification of the language in Amendment One. On this basis alone, defendants' equitable estoppel counterclaims must be dismissed.

In addition, defendants' equitable estoppel counterclaims must be dismissed for failure to establish a triable issue on the traditional elements for relief on the basis of equitable estoppel. The court must consider equitable estoppel as one of the "categories of relief that, traditionally speaking

(i.e., prior to the merger of law and equity)[21] [was] typically available in equity." Amara, 131 S.Ct. at 1878. "[T]he four traditional requirements for estoppel as follows: (1) the party to be estopped knew the true facts; (2) the party to be estopped intended for his conduct to be acted upon or acted in such a way that the party asserting estoppel had a right to believe that it was intended; (3) the party claiming estoppel was ignorant of the true facts; and (4) the misconduct was relied upon to the detriment of the parties seeking estoppel." Dawkins v. Witt, 318 F.3d 606, 612 n.6 (4th Cir. 2003) (internal quotations omitted).

With respect to the knowledge element, "it is not necessary that actual fraud be shown," or that "the representations and conduct should be labelled [sic] as fraudulent in a strict legal sense." U. S. for Use & Benefit of Humble Oil & Ref. Co. v. Fid. & Cas. Co. of New York, 402 F.2d 893, 898 (4th Cir. 1968). Nevertheless, "the doctrine proceeds upon the ground of constructive fraud or of gross negligence, which in effect implies fraud." Brant v. Virginia Coal & Iron Co., 93 U.S. 326, 335 (1876); see Froneberger v. First Nat. Bank, 203 F. 429, 432 (4th Cir. 1913) (noting that "actual or constructive fraud . . . warrants the application of the doctrine of equitable estoppel"). "[T]herefore, when the circumstances of the case repel any such inference, although there may be some degree of negligence, yet courts of equity will not grant relief." Brant, 93 U.S. at 336.

In this case, defendants have failed to show that plaintiffs "knew the true facts" at the time they made incorrect statements regarding the lump sum distribution amounts. There is no evidence that plaintiffs knew at the time that the initial lump sum amounts communicated to defendants in September and October 2013 were incorrect under the terms of the Plan. Rather, it was only upon

---

[21] The 1937 adoption of the Federal Rules of Civil Procedure united "the general rules prescribed for cases in equity with those in actions at law so as to secure one form of civil action and procedure for both." Fed. R. Civ. P. 1, Advisory Committee Notes (1937 Adoption).

the analysis of Paul Foley ("Foley"), Vice President and Senior Consulting Actuary, with plaintiff

Transamerica, on November 20, 2013, that plaintiffs knew that a mistake had been made in the

calculation of the lump sum amounts and in payment of those amounts. Specifically, Foley stated

the following in a November 20, 2013, email message to Andrew Lumb ("Lumb"):[22]

> All of the larger lump-sum amounts that were paid are significantly higher than my
> calc estimates I used for costs. I've attached a sheet that compares my LS estimate
> versus what was paid. . . . Please don't tell we calculated the present value of the
> early retirement annuity for these people. The lump-sum is unsubsidized. They
> would get PV based on a deferred to age 65 factor multiplied by the accrued benefit
> *per the amendment*.

(DE 133 at 8-9 (Lumb Depo. Ex 13)) (emphasis added). As such, Foley notes here for the first time

that the calculations of lump sum benefits were done incorrectly and not according to the terms of

Amendment One. Lumb responds, bringing in other members of his project team, "Matt- can you

check with John. He did all these calculations. I wasn't clear in the scoping guide and I never got

any questions of clarification from the engine team." (Id. at 8 (Lumb Depo. Ex. 13)). The ensuing

email discussion does not suggest that anyone at Transamerica knew there was an error in the

calculations up to that point in time. (See id.).

Rather, as noted previously, Lumb had prepared a "scoping guide" for his project team,

which summarized in Lumb's own words the criteria for his team to use for generating the

calculations. (Id.; see DE 115-1 at 15-16 (Lumb Depo. at 54-61)). As admitted by Lumb, he "wasn't

clear in the scoping guide and [he] never got any questions of clarification from the engine team."

(DE 133 at 8 (Lumb Depo. Ex 13)). Indeed, as the Ward defendants note, Foley's November 20,

2013, email "was the first time that anyone at Transamerica or DAK believed there was anything

---

[22] Lumb was at the time a project manager at Transamerica in the area of "defined benefit services" (Lumb Depo. at 9).

wrong with the lump sum distribution calculations." (DE 115 at 12). While the oversight of Lumb and his team may be described as negligent, Lumb's conduct does not evidence knowledge on the part of plaintiffs, at the time the calculations were made, that the calculations Lumb directed were incorrect.

Defendant Rodney Smith argues that plaintiffs must have had knowledge the initial lump sum calculations were incorrect because they "knew the true facts regarding how the calculation *was supposed to be made*, that the lump sum originally calculated was more than it should have been, and that the intended formula would produce a substantially lower lump sum amount than the amount represented to Mr. Smith and the other Defendants." (DE 139 at 26) (emphasis added). But, the only evidence defendant points to in support of this proposition is the statement by Foley on November 20, 2013, that the lump sum amounts paid were incorrect. There is no evidence in the record that anyone at Transamerica or DAK realized that the lump sum amounts paid were incorrect earlier than November 20, 2013, much less at the time the incorrect lump sum amounts were calculated and paid. In this respect, defendant Rodney Smith's suggestion that plaintiffs knew how the calculation "was supposed to be made" is insufficient to show that plaintiffs knew the calculations actually made were incorrect.

Similarly, defendant Rodney Smith argues that "Transamerica clearly had reviewed Amendment No. One and therefore *should have detected* any inconsistency with those expectations and acted on them if warranted." (DE 139 at 26) (emphasis added). To establish equitable estoppel, however, the proponent of the equitable remedy must show more than the party to be estopped should have discovered the error in its misrepresentation. The proponent must show that the party to be estopped "knew the true facts," and negligence in failing to discover those true facts is not

actionable.    <u>Dawkins</u>, 318 F.3d at 612 n.6; <u>Brant</u>, 93 U.S. at 336. Here, the fact that Foley conducted an audit <u>after</u> plaintiffs communicated and distributed lump sum payments, rather than <u>before</u>, demonstrates plaintiffs' own lack of knowledge of their own error, and demonstrates that equitable estoppel is not an appropriate basis for relief under the circumstances of this case.

In sum, defendants' counterclaims and defenses based upon a theory of equitable estoppel fail as a matter of law.

b.  Constructive Fraud

Defendants assert a counterclaim on the basis of constructive fraud.  Defendants do not cite, however, any case recognizing constructive fraud as a stand-alone claim in the context of ERISA. In ERISA cases, constructive fraud is rather couched as an element of equitable estoppel (discussed previously) or a type of breach of fiduciary duty (discussed further below).  <u>See Amara</u>, 131 S.Ct. at 1880 (noting that "equitable estoppel" serves as a rebuke of "all fraudulent misrepresentation"); <u>Brant</u>, 93 U.S. at 335 (stating that equity courts traditionally would not recognize equitable estoppel absent "positive fraud or concealment, or negligence so gross as to amount to constructive fraud"); <u>Bloemker v. Laborers' Local 265 Pension Fund</u>, 605 F.3d 436, 443 (6th Cir. 2010) (recognizing "constructive fraud" as an element of equitable estoppel, embodying the requirement that a defendant be "aware of the true facts" when making a misrepresentation).

Where the court determined previously that defendants' equitable estoppel theory fails for lack of knowledge on the part of plaintiffs in misrepresenting the lump sum amounts, defendants' counterclaims on the basis of constructive fraud also must fail on the same basis.

In any event, defendants have failed to demonstrate a viable counterclaim for constructive fraud, even on the basis of the state law elements they assert in their briefing. According to one

34

North Carolina Court of Appeals case that defendants cite to define the elements of a constructive fraud claim, the defendant in such a claim must take "advantage of [a] position of trust in order to benefit himself." White v. Consol. Planning, Inc., 166 N.C. App. 283, 294 (2004). Here, there is no evidence that plaintiffs benefitted themselves in any respect by making the initial misrepresentation as to the lump sum amounts. Rather, where the initial lump sum amounts included funds that in good conscience properly belonged to the Plan, plaintiffs did not benefit themselves by communicating to defendants entitlement to such initial lump sum amounts. Likewise, where plaintiffs were obligated to correct their initial misrepresentations and seek to pull back portions of lump sum payments already made, plaintiffs gained no benefit from the misrepresentations, but rather have experienced protracted disputes and litigation as a result.

Accordingly, defendants' counterclaims based upon constructive fraud fail as a matter of law.

### c. Breach of Fiduciary Duty / Surcharge

Defendants assert a counterclaim on the basis of breach of fiduciary duty, for which they assert entitlement to a remedy in the form of a surcharge.

"Equity courts possessed the power to provide relief in the form of monetary compensation for a loss resulting from a trustee's breach of duty." Amara, 131 S. Ct. at 1880. "Indeed, prior to the merger of law and equity this kind of monetary remedy against a trustee, sometimes called a 'surcharge,' was 'exclusively equitable.'" Id. (quoting Princess Lida of Thurn and Taxis v. Thompson, 305 U.S. 456, 464 (1939)). "The surcharge remedy extend[s] to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary." Id.

To illustrate the remedy of surcharge, the Supreme Court in Amara contrasted it with the

35

remedy of equitable estoppel. On the one hand, equitable estoppel "operates to place the person entitled to its benefit in the same position he would have been in had the [mis]representations been true," id. (quotations omitted), and, "to impose a remedy equivalent to estoppel, a showing of detrimental of reliance must be made." Id. at 1881. On the other hand, for a breach of fiduciary duty, equity courts "simply ordered a trust or beneficiary made whole following a trustee's breach of trust." Id. "In such instances equity courts would mold the relief to protect the rights of the beneficiary according to the situation involved." Id.

Nevertheless, "just as a court of equity would not surcharge a trustee for a nonexistent harm, a fiduciary can be surcharged under § 502(a)(3) only upon a showing of actual harm – proved (under the default rule for civil cases) by a preponderance of the evidence." Id. "Although it is not always necessary to meet the more rigorous standard implicit in the words 'detrimental reliance,' actual harm must be shown." Id. at 1881-82. In sum, to be entitled to the remedy of surcharge for a breach of fiduciary duty, a claimant must "show harm and causation." Id. at 1881.

Plaintiffs implicitly recognize that breach of fiduciary duty is an appropriate equitable claim under the circumstances of this case, where they do not dispute that a breach of fiduciary duty in fact occurred in making their initial incorrect lump sum calculations and distributions. (DE 183 at 7). Nor do plaintiffs dispute that surcharge may be available as a matter of law to remedy any breach of fiduciary duty. (See id.). Plaintiffs dispute, however, whether and to what extent, if any, damages were caused by such breach in this case, and whether defendants should be entitled to compensation for such breach.

Defendants assert various categories of purported losses arising from plaintiffs' breach of fiduciary duty:

(1) Lost opportunity of investing the disputed funds;

(2) Taxes and penalties if the Ward defendants and defendant Rodney Smith are required to return the disputed amounts;

(3) Lost opportunity for interest on entire IRA account, when frozen by Transamerica for 20 days in January 2014;

(4) Maintenance fees and advisor fees;

(5) Life altering decisions made related to their retirement options;

(6) Job opportunities declined or accepted upon reliance of misrepresentations; and

(7) Attorneys' fees.

As a preliminary matter, to determine the appropriate surcharge remedy, if any, the court must first determine the extent of the breach of fiduciary duty. See Amara, 131 S.Ct. at 1881. As noted previously, where the lump sum overpayments belong in good conscience to the Plan, the breach of fiduciary duty does not involve plaintiffs' assertion of the corrected lump sum amounts in December 2013. As such, the asserted loss of the right to keep and invest the lump sum overpayments is not a harm resulting from any breach of fiduciary duty.

Similarly, where the overpayments belong to the Plan, the breach of fiduciary duty does not involve plaintiffs efforts' to take back such overpayments after plaintiffs had correctly communicated and explained the correct lump sum distributions in accordance with the terms of the Plan. As such, recovery for alleged freezing of accounts, "scare tactics," or "threatening" language in correspondence in December 2013 and thereafter is not remediable through surcharge. (See, e.g., DE 171 at 17). Nor are attorneys' fees incurred in disputing the corrected lump sum amounts. (See, e.g., id.). Likewise, costs that may be incurred as a result of the choice by defendants after that point to keep the overpayments, such as taxes, penalties, and advisor fees, do not have a causal connection between any breach of fiduciary duty on the part of plaintiffs. (See, e.g. id. at 18-19).

Rather, the extent of plaintiffs' breach of fiduciary duty comprises a narrower scope of conduct: (1) all misrepresentations made in communications with defendants between July 2013 and November 2013, regarding the estimated or actual lump sum distribution amounts, which were based on incorrect calculations not in accordance with the terms of the Plan;[23] (2) all misrepresentations in the same communications that those lump sum amounts had relative value of 100% of the Single Life Annuity;[24] and (3) the initial distribution of incorrect lump sum amounts in September and October 2013 not in accordance with terms of the Plan.

Thus, the inquiry that remains for the court is whether defendants have forecasted sufficient evidence of actual harm resulting from those misrepresentations and excess payments, during that time period between approximately July 2013 and December 2013. Falling in this category of potential harm, for example, the Ward defendants assert that "[d]efendants' spouses waived their rights to any benefits under the Plan, and . . . each Defendant made 'life altering decisions related to their retirement options.'" (DE 171 at 17).[25] The Ward defendants, however, do not offer any

[23] For purposes of the present analysis, the court rejects plaintiffs' suggestion that estimates made informally online or in person to DAK employees starting in July 2013 are not actionable misrepresentations as to the amount of lump sum payout expected for each employee. In analyzing potential surcharge damages, the court will take into account all such misrepresentations. (E.g., DE 131, Rodney Smith Aff. ¶¶ 3, 12-15 (stating that "in the summer of 2013" he estimated his lump sum benefit using an online tool and he "discussed the lump sum option with DAK's human resources staff")).

[24] Plaintiffs additionally misrepresented in their December 5, 2013, revised Lump Sum Application forms, attached to their December 5, 2013, correction letters, that "[t]he relative value of this [Special One-Time Lump Sum Payout] benefit to the Single Life Annuity is 100%," (AR 225), whereas for defendant Bryant, for example, the relative value in fact was only 63%. (AR 233). Plaintiffs corrected this misrepresentation in their December 16, 2013, explanation letters, expressly noting the reduced relative value associated with the corrected lump sum payment amount. (E.g. AR 233; DE 139-7 at 3 (defendant Rodney Smith)). Defendants do not seek surcharge for this particular misrepresentation, which remained uncorrected for the time period between December 5, 2013, and December 16, 2013. Defendants also do not identify any actual damages incurred during this time period resulting from such misrepresentation. Accordingly, the court in its analysis only considers further those misrepresentations noted above in the text.

[25] The Baker defendants suggested similar harm in their counterclaims. (E.g., DE 57, ¶31 f). However, the Baker defendants do not assert in their summary judgment briefing any harm resulting from breach of fiduciary duty, other than as premised on their interpretation of the Plan. (See DE 169 at 11).

38

individualized listing or evidence of actual harm. Rather, they point to their interrogatory responses in which they state, collectively, "each Defendant made life-altering decisions such as retirement options, further employment, . . . and investment decisions related to investment of the lump sum benefit." (DE 147 at 5 (Defs' Interrog. Resp. 2)). As for the Ward defendants collectively, this general interrogatory response does not create a triable issue as to entitlement to surcharge as actual harm for plaintiffs' breach of fiduciary duty.

The only Ward defendant mentioned more specifically by name is defendant Sellers, who is reported to have "mov[ed] out of the state." (Id.). With respect to defendant Sellers, the Ward defendants state:

> "Mr. Sellers . . . took a job in Texas based on the fact that he could defer his retirement until later and not receive it now with a 25% tax. He would be paying an additional 10% in extra taxes on his retirement if taken now, which would have totaled $19,000 a year. Mr. Sellers intended to work an extra nine years which would be $1,900 x 9 = $17,100 in additional taxes. If he had not received the full amount of his retirement he would not have moved to Texas, which was costly as he had to sell his house and pay someone else to do the work that he would have done. These costs are approximately $10,000.00."

(Id. at 6-7 (Defs' Interrog. Resp. 3)).

These statements, while more specific, are insufficient to show a causal connection between the amount of lump sum distribution and Sellers's decision making during the limited time period between the initial incorrect lump sum distribution communications and the corrected lump sum distribution communications. While defendant Sellers suggests he "would not have moved to Texas" if he had not received the initial lump sum distribution amount, (DE 147 at 7 (Defs' Interrog. Resp. 3)), the Ward defendants offer no evidence regarding when the decision to move to Texas was made or when the move took place. Furthermore, there is a lack of evidence on whether the decision to take another job and to move to Texas would have been any less reasonable or feasible if the

39

correct lump sum amount had been offered. In the absence of such evidence, any causal inference between plaintiffs' breach of fiduciary duty and defendant Sellers' alleged costs and harm is speculative and not sufficient to survive summary judgment.

Defendant Rodney Smith asserts a similar category of harm due to an employment decision allegedly resulting from plaintiffs' misrepresentations. In particular, defendant Rodney Smith asserts that he "relied on the [mis]representations of the Plaintiffs when he declined an offered transfer to another DAK facility in the summer of 2013." (DE 139 at 24). He asserts that a manager at another DAK facility in Columbia, South Carolina, Bryan P. Beck ("Beck"), offered him a position in the maintenance division at the South Carolina facility. In his affidavit, Beck states:

> In the summer of 2013, I met with Rodney Smith, who was then employed at the Cape Fear facility, about one of the positions available at the Columbia, S.C., facility, and I determined that he was my top choice for that job. I offered Rodney Smith the job if he wished to relocate to Columbia, S.C. Had Rodney Smith accepted this offer, I would have hired him. Rodney Smith later informed me, however, that DAK had offered him a generous retirement package, which he had decided to accept instead.

(DE 132 ¶¶ 7-10). Beck was separated from DAK on September 6, 2013. (Id. at ¶3). In his affidavit, defendant Rodney Smith states that in the Summer of 2013, DAK representatives and an online retirement calculation tool informed him that his lump sum payment would be equivalent to an "unreduced benefit" under the Plan. (DE 131 ¶10). In reliance on those misrepresentations, he "declined the offered job at DAK's South Carolina facility." (Id. ¶15). Defendant Rodney Smith states:

> Had I known in August or September of 2013 that the lump sum amount would be $363,325.52, I would not have chosen to retire; I would have accepted the transfer position in South Carolina. Despite attempting to recover funds from me, DAK never offered me the job that I declined in reliance on the original representations about the lump sum amount. Because of the representation of DAK and Transamerica, I have foregone substantial earnings and benefits that I would have

40

received had I accepted the transfer position in South Carolina.
(Id. ¶23).

This evidence presented by defendant Rodney Smith is insufficient to establish a triable issue of fact as to a surcharge remedy for several reasons. First, defendant Rodney Smith provides no evidence of a binding job offer by DAK. Beck, who left DAK in September 2013, states that he, Beck, "offered Rodney Smith the job if he wished to relocate to Columbia, S.C." (DE 132 ¶8). Thus, the purported job offer came not from DAK, but from an employee of DAK, and with contingencies. Second, Beck states that defendant Rodney Smith later informed Beck that defendant Rodney Smith had decided to accept "a generous retirement package" instead. (Id. ¶ 10). Where Beck states that he was separated from DAK on September 6, 2013, it is unreasonable to infer that, at that later unspecified point in time, DAK could have or would have been able to offer defendant Rodney Smith a position at the South Carolina facility, if Rodney Smith "had . . . known in August or September that the lump sum amount would be $363,325.52." (DE 131 ¶21).

In other words, it is speculative that, if plaintiffs had correctly informed defendant Rodney Smith of the correct lump sum amount of $363,325.52 in the Summer of 2013, that DAK would have offered defendant Rodney Smith a position in the South Carolina facility. Moreover, even if DAK would have offered him the position in the Summer of 2013, in light of Beck's own separation from DAK on September 6, 2013, it is conjectural that the job in the South Carolina facility would have come to fruition or even continued to exist past September 6, 2013. Indeed, defendant Rodney Smith admits that "DAK never offered me the job that I declined in reliance on the original representations about the lump sum amount." (DE 131 ¶ 22). In sum, the requisite causal connection between the misrepresentations and the alleged lost job opportunity is not present.

41

In sum, defendants have failed to forecast evidence establishing a causal connection between plaintiffs' misrepresentations as to the amount and value of lump sum payments made and any actual harm incurred. Any surcharge remedy would be based upon speculation and conjecture. Therefore, summary judgment is warranted on defendants' claims for breach of fiduciary duty and surcharge.

**CONCLUSION**

Based on the foregoing, plaintiffs' first motion for summary judgment (DE 153) is GRANTED IN PART and DENIED IN PART AS MOOT. In particular, plaintiffs are entitled to summary judgment on their equitable restitution claim against the Ward defendants and defendant Rodney Smith, whereas plaintiffs' claim of equitable restitution against the Baker defendants is DISMISSED AS MOOT. That portion of plaintiffs' motion for summary judgment seeking dismissal of the Baker defendants' counterclaims is GRANTED, and such counterclaims are DISMISSED. Plaintiffs' second motion for summary judgment (DE 181) is granted, and defendant Rodney Smith's counterclaims are DISMISSED. The motions for summary judgment filed by the Ward defendants (DE 114), and defendant Rodney Smith (DE 130) are DENIED. Plaintiffs' motion to strike expert testimony (DE 157) is DENIED AS MOOT. The court DENIES the parties' joint motion for hearing (DE 152), because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process. The clerk is DIRECTED to close this case.

SO ORDERED, this the 29th day of September, 2015.

LOUISE W. FLANAGAN
United States District Judge

42

# APPENDIX A

Excerpts from the Plan, Article II, Section 2.1, Definitions:


(1)  Accrued Benefit or Accrued Retirement Benefit:  That portion, at any given date, of a Participant's Normal Retirement Benefit that has accrued at such date.  In no event shall a Participant earn any additional Accrued Benefit after December 31, 2006.

(2) Actuarial Assumptions and Actuarial(ly) Equivalent:  A benefit of equivalent cost value, determined as of the date the computation is effective. . . .

\*        \*        \*

(20)  Early Retirement Age:  The later of the Participant's fiftieth birthday or the completion of 15 Years of Service for vesting.

(21) Early Retirement Benefit:  The benefit payable at a Participant's Early Retirement Date, as described in Section 4.3.

(22)  Early Retirement Date:  The first day of any calendar month after a Participant's Early Retirement Age and before his Normal Retirement Age on which the Participant elects to begin receiving Early Retirement Benefits.

\*        \*        \*

(42)  Normal Retirement Age:  The later of the Participant's sixty-fifth birthday or the fifth anniversary of his participation in the Plan.

(43)  Normal Retirement Benefit:  The benefit payable at the Normal Retirement Date, as described in Section 4.1.

(44)  Normal Retirement Date:  The first day of the month coinciding with or next following a Participant's Normal Retirement Age.

\*        \*        \*

(56)  Qualified Joint and Survivor Annuity:  An immediate annuity for the life of the Participant with a survivor annuity for the life of the Participant's Surviving Spouse that is 50 percent of the amount payable during the joint lives of the Participant and spouse, and that is the Actuarial Equivalent of the normal form of annuity or any optional form of benefit offered by the Plan.  The Qualified Joint and Survivor Annuity for a Participant who is not married to a Surviving Spouse shall be an annuity for the life of the Participant.